IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RHONDA L. ANDERSON,

                  Plaintiff,                  OPINION AND ORDER

v.

                                          15-cv-556-wmc

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                  Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Rhonda L. Anderson seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, which denied her application for Social Security Disability Insurance Benefits and Supplemental Security Income. In her appeal, plaintiff raises four challenges. For the reasons provided below, the court will affirm the Commissioner's determination, enter judgment in defendant's favor, and close this case.

BACKGROUND

**A. Overview of Claimant**

Anderson was 50-years-old at the alleged onset date and at the time she applied for benefits, and 52 at the time of the hearing. She has at least a high school education, is able to communicate in English, and has past work experience as a certified nursing assistant ("CNA") and sweeper/cleaner. Anderson testified at her hearing that he last worked in December 2010 as a CNA, but could not do the work because of a lifting restriction of 50 pounds. She claims disability based on obesity and degenerative joint disease with right knee replacement.

### B. Medical Record

The bulk of plaintiff's medical records concern treatment before her knee replacement surgery in September 2012. In June 2012, a note by Lance E. Sathoff, M.D. indicated a diagnosis of right knee degenerative joint disease and described the treatment options, including the recommended treatment of total knee arthroplasty. (AR 210.) These notes are consistent with the treatment notes of physician assistants in the same practice, indicating that Anderson returned to the clinic after three years for evaluation of her right knee because the pain was getting worse.

On September 17, 2012, Anderson had right knee replacement surgery. (AR 226-27.) A two-week post operation appointment on October 2, 2012, with PA-C Karl DePauw, noted that she was "doing well," her pain was 3/10 and her incision was well healed. (AR 248.) She also reported no tingling, numbness or weakness, and her range of motion was "good," specifically 86 flexion. (*Id.*)

On October 31, Dr. Sathoff saw Anderson for a six-week post-operation appointment. The notes indicate that Anderson again reported pain as 3/10, and that she was "ambulating fair, with assistive devices." (AR 248.) Dr. Sathoff noted that Anderson again reported no tingling, numbness, or weakness in the affected extremity. At that time, his physical exam revealed that: the incision was well healed, range of motion was fair, she was stable in valgus/varus, and the patella tracked centrally. An x-ray further confirmed that the knee was well aligned and well fixed. (*Id.*) Overall, Dr. Sathoff concluded that Anderson was "doing well." (*Id.*)

Anderson also attended two physical therapy appointments on October 10 and October 22, 2012. She was, however, a no show for three other appointments and called

to cancel two.  (AR 228.)  Anderson was eventually discharged from therapy on January 30, 2013, because she did not return or call for follow-up therapy appointments.[1]

Anderson returned to Dr. Sathoff in January 2014 for review of a recent elbow injury and renewed right knee pain.  The medical notes state that she had "some stiffness" in her right knee, but physical examination revealed that the incision was well-healed and that her range of motion is at 90-plus degrees.  (AR 376-77.)  X-rays revealed "satisfactory position of her right total knee arthroplasty."  (AR 377.)  The noted plan was to "work on motion."  (*Id.*)  Dr. Sathoff indicated that Anderson "is not to the point where she wishes to have anything further treated for her knee."  (*Id*.)  After reviewing her medical file, state agency physicians came to a similar assessment, limiting Anderson to light work.

### C. ALJ's Decision

The ALJ held a hearing on December 23, 2013, and issued an opinion dated April 24, 2014.  The ALJ concluded that Anderson was not disabled.  (AR 17.)  As an initial matter, the ALJ found that Anderson suffered from two severe impairments -- obesity and degenerative joint disease with right knee replacement.  Nevertheless, the ALJ found neither impairment nor combination of impairments meets or medically equals the severity of one of the listed impairments.  (AR 19.)  In making this determination, the ALJ also considered whether Anderson's diagnoses of Grave's disease, hypertension, dyslipidemia, and hypercholesterolemia constituted severe impairments, but concluded otherwise because they are all "well controlled with prescribed medication."  (*Id.*)  Similarly, the ALJ

---

[1] Muddling the record is a November 10, 2013, note from Amy L. Simnatel, M.D., more than nine months later, that indicates Anderson has no insurance and was feeling depressed since she was now on her sixth attempt to qualify for disability.  (AR 355.)  Although she apparently had some capacity to pay for medical treatment, as she returned for care a few months later.

3

considered one treatment note indicating that Anderson suffered from depression and was prescribed medication, but found that "the record does not support a finding that this caused significant limitations for an extended period." (*Id.* (citing Ex. B9E).)

Material to one of plaintiff's challenges, the ALJ specifically considered Anderson's obesity. The ALJ noted that her BMI score was 51.4, but citing the correct regulation (Social Security Ruling 02-01p), concluded:

> Overall, the evidence does not reflect that the claimant's obesity, when considering its impact on the relevant body systems individuals or in combination results in a listing being met or medically equaled. In addition, the claimant does not allege specific work-related limitations secondary to obesity.

(AR 20.) Still, the ALJ purported to have considered Anderson's obesity in "reducing her functional capacity." (*Id.*)

At step 5, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. When considered in light of the record as a whole, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 22.) In so finding, the ALJ relied on the following:

- o The fact that Anderson had right knee replacement surgery in September 2012, and at the six-week recheck, she was doing well, and x-rays showed good alignment.

- o She failed to attend a follow-up appointment or follow the prescribed physical therapy.

- o Despite this, she was seen in January 2014, and her treating physician noted that her range of motion of her right knee was 90+ degrees, and that x-rays showed "satisfactory position of her right knee." "Despite continued complaints of pain, the claimant stated that she did not want any further treatment for her knee."

- There was no evidence of a medically necessary use of an assistive device, such as a cane.

- A face-to-face interview in June 2013 with an interviewing agency representative noted that Anderson demonstrated no difficulty in sitting, standing or walking.

- Her reported daily activities included cleaning the house, doing dishes, vacuuming, sweeping the floors, driving her son to school and attending his activities.

- Anderson provided inconsistent reports about the length of time she could walk, sit and stand.

- Although prescribed pain medication, Anderson declined, preferring to treat her pain with over-the-counter Tylenol.

In considering Anderson's limitations and in crafting the RFC, the ALJ placed some weight on the state agency medical consultants, who concluded Anderson was capable of light work, but the ALJ also adopted additional limitations. The ALJ further found that: (1) Anderson's treating physician's opinion about her "disabling" right knee arthritis occurred *before* her knee replacement surgery; and (2) "[n]o other medical source has proffered an opinion as to the claimant's functional capabilities or restricted her from performing the range of unskilled light work activities assessed in this decision." (AR 22-23.)

As a result, the ALJ's RFC limited Anderson to light work, with the following, additional limitations: "precluded from crawling, kneeling and climbing ropes, ladders and scaffolds. The claimant can occasionally stoop, bend, crouch and climb ramps and stairs. She requires a sit/stand option at the workstation that limits her to standing no more than 30 minutes at one time and sitting no more than 20 minutes at one time." (AR 20.)

Finally, the ALJ concluded that Anderson is unable to perform any past relevant work, but could perform jobs of packager, office clerk and counter clerk. (AR 23-24.)

OPINION

Anderson raises four challenges on appeal: (1) unresolved conflicts between the VE testimony and the DOT/SCO; (2) invalid waiver of right to counsel; (3) failure to consider proper listing; and (4) flawed credibility assessment, specifically with respect to the ALJ's treatment of Anderson's obesity. The court will address each in turn.

**I. Unresolved Conflict between the Vocational Expert Testimony and DOT/SCO**

Social Security Ruling 00-4p places an affirmative duty on the ALJ to first ask the vocational expert whether his testimony conflicts with the *Dictionary of Occupational Titles* ("*DOT*"), and if it "appears to conflict," to elicit "a reasonable explanation for the apparent conflict." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (citing SSR 00-4p at 5); *see also Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).[2] Here, while the ALJ asked the VE if he was familiar with the *DOT*, she did not ask if his testimony was consistent with it. (AR 53.) Even so, the VE not only indicated familiarity, but *relied* on the *DOT* in listing occupations that would accommodate the limitations described in the ALJ's hypotheticals. Read as a whole, this testimony is enough to conclude that the VE viewed his testimony to be consistent with the *DOT*.

This technical lapse aside, plaintiff's substantive challenge is that the ALJ failed in her duty to obtain a reasonable explanation for an apparent conflict between the *DOT* definitions and the vocational expert's testimony. Failure to ask a vocational expert about

---

[2] "The Dictionary, published by the Department of Labor, gives detailed physical requirements for a variety of jobs. The Social Security Administration has taken 'administrative notice' of the *DOT*." *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (citing 20 C.F.R. § 416.966(d)(1)) (italics added).

6

any conflict between the testimony and the DOT is considered harmless error provided there is no actual conflict. *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). Anderson identifies two purported conflicts, both of which the court now rejects.

*First*, plaintiff contends that the ALJ failed to account for an apparent conflict between the VE's testimony that a claimant with Anderson's RFC could perform the occupation of "packager" versus the *DOT's* definition for that same occupation. Specifically, plaintiff contends that "a Packager requires frequent climbing in general," which conflicts with "the ALJ's RFC and hypothetical question" that precluded "climbing ropes, ladders, and scaffolds and would limit Anderson to occasional climbing ramps and stairs." (Pl.'s Br. (dkt. #9) 9.) Plaintiff, however, fails to offer *any* support or explanation for her contention that a packager would require climbing. At the very least, this requirement is not obvious from the description of physical requirements. *See DOT* § 522.687-018. Moreover, as defendant points out, "even if Plaintiff is correct on that point, the ALJ could still rely upon the VE's testimony regarding the jobs of office clerk and counter clerk." (Def.'s Opp'n (dkt. #11) 14.)[3]

*Second*, plaintiff contends that there is a conflict between the VE's testimony that all three occupations would allow for the sit/stand option and the *DOT* descriptions of those three positions. Here, the ALJ's exchange with the VE demonstrates that the ALJ required the VE to consider, and the VE did consider, whether the *DOT* definitions would accommodate the sit/stand option limitation. The first hypothetical question posed by the

---

[3] Plaintiff's characterization that the number of jobs provided by the VE for those two jobs is "minimal" is belied by the actual evidence that those two positions encompass over 300,000 positions nationally and over 12,000 in Wisconsin. (Def.'s Opp'n (dkt. #11) (citing AR 24, 55).)

7

ALJ only limited the claimant to light work, with limitations about climbing, crawling, kneeling, stopping, bending and crouching. In the second hypothetical, however, the ALJ added a requirement of a sit/stand option so that the person would be able to "stand no more than 30 minutes at one time and sit no more than 30 minutes at one time." (AR 55.) In response to that question, the VE determined that the cashier position offered in the prior hypothetical would be eliminated but that the claimant would still be able to perform the office clerk, counter clerk and packager positions. (*Id.*) This testimony clarified that the VE considered whether the specific DOT positions would allow for a sit/stand option. Therefore, there is no conflict, apparent or otherwise, between his testimony and the DOT.

Even if an unresolved conflict actually existed with respect to both of those claimed by the plaintiff, the ALJ's obligation to obtain a reasonable explanation from the expert is only triggered if the conflict is "so obvious that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (citing *Prochaska,* 454 F.3d at 735); 20 C.F.R. §§ 404.1366(e), 416.966(e); SSR 00-4p. Here, plaintiff fails to explain how either purported conflict would be apparent to the ALJ. Instead, plaintiff quotes language from an RFC -- presumably applying to another of plaintiff counsel's clients (an unfortunate, but frequent cut-and-paste error) -- limiting the claimant to no production-type work, the amount of fingering and handling, changes in tasks, and contact with people. (Pl.'s Br. (dkt. #9) 12, 13-14; Pl.'s Reply (dkt. #12) 3 n.1 (repeating same erroneous language).) As such, plaintiff utterly failed to explain how either of these purported conflicts was "so obvious" as to require the ALJ to probe for an explanation.

8

## II. Invalid Waiver of Counsel

While Social Security claimants have a statutory right to counsel at a disability hearing, 42 U.S.C. § 406, this right may be waived as long as the evidence shows the claimant did so knowingly. *Ratulowski v. Astrue*, 380 F. App'x 552, 554 (7th Cir. 2010); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The parties agree that a proper waiver must contain an explanation of: (1) the benefits of counsel; (2) the possibility of free counsel or a contingency fee arrangement; and (3) the statutory 25% withholding limitation on attorneys' fees, including required court approval of the fees. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991).

Here, the ALJ informed Anderson of all three requirements:

> I am required to explain that you have the right to be represented by an attorney or a non-attorney. This person can help you obtain and submit records, explain medical terms, make requests, protect your rights, and present the evidence in a light most favorable to your case. A representative may not charge or receive a fee unless the Agency approves it, and a representative does not normally get paid unless you are awarded benefit, and then they may only accept 25 percent of your back benefits of $6,000.00, whichever is less.
>
> A representative may charge you for certain expenses such as copying charges or postage, but some legal service organizations may off[er] completely free representation, but that is based on needs. You would have to meet their requirements and qualify under their rules. . . . We can give you a list of resources in order to help you obtain a representative if you choose to do that[.]

(AR 32.) The ALJ then asked Anderson how she would like to proceed, to which she responded, "by myself." (AR 33.) Finally, the ALJ acknowledged that "we, generally, have the claimant that is here [i.e., testifying in person] sign a document to that effect. But you

9

are testifying under oath that you understand your rights, and that you do want to proceed without it. So, we will go ahead and have that document just mailed to you." (*Id.*)

Even if a writing were required, the record also reflects that Anderson *did* sign the waiver the same day as the hearing. (AR 120.) Plaintiff's argument that she was not provided a paper copy, that the waiver was not conducted at the hearing, or that the information she was provided orally was somehow insufficient is entirely belied by the record.[4]

### III. Failure to Consider Proper Listing

Next, Anderson raises two related challenges concerning the ALJ's consideration of whether she met a listing. First, Anderson contends that the ALJ should have considered whether she met Listing 1.03, which concerns reconstructive surgery or surgical arthrodesis of a major weight bearing joint. Second, Anderson argues that the ALJ's consideration of Listing 1.02, major dysfunction of any joint, was insufficient. As the Commissioner persuasively argues in response, both of these listing require Anderson to demonstrate an inability to ambulate. (Def.'s Opp'n (dkt. #11) 8 (discussing this element as a share element, with 1.03 requiring an inability to ambulate lasting or expected to last 12 months).)

---

[4] The record also contains a two-page document titled "Your Right to Representation," which was apparently included with her notice of hearing. (AR 111-12.) If this were the only information plaintiff had received, the court might well agree with plaintiff, as it has in other cases challenging waiver of counsel, that mere provision of that document would not satisfy the requirement that the waiver be knowing absent proof the claimant read and understood the document. *See Lovell v. Colvin*, No. 14-CV-708-WMC, 2017 WL 108071, at *3 (W.D. Wis. Jan. 11, 2017) (remanding due to invalid waiver of counsel). As explained above, however, plaintiff was provided the required information orally during the hearing *and* she indicated that she understood her rights and waived counsel, while under oath, then also signed a waiver.

Critically, the listing provides a specific definition for "inability to ambulate":

> b. What we mean by inability to ambulate effectively.
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00B.

Here, plaintiff has failed to demonstrate that she meets this listing. In her reply, plaintiff points to her testimony at the hearing that she needs a cane to walk in stores and that she could only walk for about 15 minutes before taking a break. (Pl.'s Reply (dkt. #12) 10 (citing AR 43).) This testimony, however, is insufficient to demonstrate that an assistive device is required for walking. Moreover, other than the use of a cane post-surgery, there is no indication that a cane is medically required. To the contrary, as the

ALJ pointed out, a face-to-face interview in June 2013 with an interviewing agency representative specifically noted that Anderson demonstrated no difficulty in sitting, standing or walking. The court finds no error in the ALJ's consideration of whether plaintiff met a listing. At a minimum, any error would have been harmless since plaintiff failed to put forth evidence to support an inability to ambulate -- a required element under Listing 1.02 and 1.03.

## IV. Credibility and Treatment of Obesity

In this last challenge, plaintiff raises a hodgepodge of issues with respect to the ALJ's treatment of her credibility and obesity. The hook, as plaintiff explains in her opening brief, is that if the ALJ had limited her to sedentary work, she would have met Grid Rule 20.14, which would have rendered her disabled.

Anderson testified that she had to use a cane if walking in a store for a "long time," could sit at one time for 30 minutes before having to change position, and could walk about 15 minutes before having to sit down. (AR 43-46.) Plaintiff fails to explain how the light work exertion level RFC with additional physical limitations and the sit/stand option described above would not accommodate her own self-reported limitations. As such, any error in discounting her credibility appears to be harmless.

In finding that her reported limitations were not as serious as her actual limitations, the ALJ did note Anderson's failure to treat her pain, in particular, her failure to attend post-surgery, follow-up appointments and to complete physical therapy. In response, plaintiff directs the court to a note in one of her medical records that she lacked insurance. That note, however, was several months *after* her right knee replacement surgery, as well as

the scheduled physical therapy for which she was a no-show or canceled. Regardless, this was one reason among several on which the ALJ relied in discounting her credibility.

Finally, with respect to the ALJ's treatment of Anderson's obesity, the ALJ considered whether her obesity would further magnify the limitations posed by her degenerative joint disease after citing the appropriate regulation. (AR 20.) Tellingly, Anderson did not allege specific work-related limitations posed by her obesity. Regardless, in crafting the RFC, the ALJ considered her obesity in limiting her to light work and further limiting her physical movements, including providing her with a sit/stand option. In light of the fact that the RFC addresses Anderson's self-reported limitations with respect to walking, sitting and standing, as described above, the court is hard-pressed to find any abuse of discretion by the ALJ in assessing her credibility or the impact of her obesity on her functional limitations. Accordingly, the court rejects this basis as well.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Rhonda L. Anderson's application for disability benefits is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 12th day of May, 2017.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge